IN THE SUPREME COURT OF NORTH CAROLINA

No. 429A19

Filed 25 September 2020

IN THE MATTER OF:  E.B.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 834 S.E.2d 169 (N.C. Ct. App. 2019), affirming an order terminating respondent-father's parental rights entered on 30 November 2018 by Judge Kevin Eddinger, in District Court, Rowan County.  Heard in the Supreme Court on 17 June 2020.

> *Jane R. Thompson for petitioner-appellee Rowan County Department of Social Services.*

> *Jeffrey L. Miller, for respondent-appellant father.*

EARLS, Justice.

Respondent-father appeals from the Court of Appeals' affirmance of the trial court's order terminating parental rights to his minor child, E.B. (Ella).[1] Between 12 May 2016 and 25 January 2018, the trial court conducted six permanency planning and review hearings and entered six orders imposing numerous conditions that respondent was required to satisfy prior to obtaining custody of Ella. However, as petitioners conceded before the Court of Appeals, the trial court lacked jurisdiction to conduct the permanency planning and review hearings under N.C.G.S. § 7B-200

---

[1] We will refer to E.B. throughout the remainder of this opinion by the pseudonym "Ella" for ease of reading and to protect the privacy of the juvenile.

because the Rowan County Department of Social Services (DSS) "failed to file a proper juvenile petition consistent with the requirements of N.C.[G.S.] §§ 7B-402(a) and 403(a), and thus no juvenile abuse, neglect, or dependency action was ever commenced." *In re E.B.*, 834 S.E.2d 169, 172 (N.C. Ct. App. 2019). Indeed, Ella was never adjudicated to be an abused, neglected or dependent child. Her father indicated his desire to have custody of her and to care for her from the day he learned of her birth.

On 30 November 2018, the trial court entered an order terminating respondent's parental rights on the grounds of neglect, failure to make reasonable progress, and willful abandonment. The Court of Appeals affirmed the trial court's termination order on the willful abandonment ground. *Id.* at 175. Judge Hampson dissented. Judge Hampson would have held that because the facts supporting the grounds for termination as adjudicated by the trial court were "inextricably intertwined" with the concededly invalid permanency planning and review hearings, the trial court failed to prove grounds for termination by "clear, cogent, and convincing evidence." *Id.* (Hampson, J., dissenting).

We substantially agree with Judge Hampson and hold today that petitioners have failed to prove by clear, cogent, and convincing evidence that respondent willfully abandoned his child. We also hold that petitioners have failed to prove that any other ground existed to terminate respondent's parental rights. Accordingly, we reverse.

## Standard of Review

"A trial court is authorized to order the termination of parental rights based on an adjudication of one or more statutory grounds." *In re J.A.E.W.*, 846 S.E.2d 268, 271 (N.C. 2020). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes. N.C.G.S. § 7B-1109(e), (f) (2019)." *Id.*

The trial court found three separate grounds for terminating respondent's parental rights: (1) neglect, pursuant to N.C.G.S. § 7B-1111(a)(1); (2) failure to make reasonable progress, pursuant to N.C.G.S. § 7B-1111(a)(2); and (3) willful abandonment, pursuant to N.C.G.S. § 7B-1111(a)(7). We review a trial court's adjudication under N.C.G.S. § 7B-1109 "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusion of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984). We review the trial court's conclusions of law *de novo*. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

## Background

Ella was born on 18 February 2016. The next day, Ella's mother relinquished her parental rights, placing Ella in nonsecure custody with DSS. By relinquishing her parental rights, Ella's mother agreed to the "transfer of legal and physical custody

-3-

of the minor to the agency for the purposes of adoption." N.C.G.S. § 48-3-703(a)(5) (2019). As an exercise of that custodial authority, DSS placed Ella in foster care.

Ella's mother informed DSS that she believed respondent was Ella's biological father. Sometime thereafter, DSS informed respondent that he had been named by Ella's mother as the putative biological father of a newborn. When DSS contacted respondent, he reported that he was "excited" to be Ella's father. He agreed to submit to a paternity test. Even before paternity was confirmed, respondent expressed his desire to be a parent to Ella. However, until respondent was confirmed as Ella's biological parent, DSS possessed sole legal custody of Ella. *See* N.C.G.S. § 48-3-601, -705.

On 23 March 2016, before the results of the paternity tests were known, respondent voluntarily entered into an out-of-home family services agreement with DSS. Respondent stated that he wanted to do "whatever [DSS said] was necessary." Because he was working and had his own home, he believed the reunification process "would just go over smoothly and my daughter would be released." On 19 April 2016, a paternity test confirmed that respondent was Ella's biological father.

Between 12 May 2016 and 25 January 2018, the trial court conducted six permanency planning and review hearings. After each hearing, the court entered an order imposing numerous requirements on respondent before he could be reunified with Ella. These requirements incorporated the recommendations DSS made in the out-of-home family services agreement. After the first five hearings, the trial court

concluded that Ella's "primary permanent plan shall be reunification with [respondent], with a secondary plan of guardianship to a relative or a court approved caretaker." After the final hearing, the trial court changed the primary plan to "adoption, with a secondary plan of reunification."

DSS never filed a petition seeking to have the trial court adjudicate Ella an abused, neglected, or dependent juvenile pursuant to N.C.G.S. §§ 7B-402(a) and - 403(a). Thus, the trial court lacked subject-matter jurisdiction to conduct permanency planning and review hearings, and its orders lacked the force of law. *See In re T.R.P.*, 360 N.C. 588, 593, 636 S.E.2d 787, 792 (2006) ("A trial court's subject matter jurisdiction over all stages of a juvenile case is established when the action is initiated with the filing of a properly verified petition.").

When Ella was born, respondent was helping to raise three of his own juvenile children. Within months, respondent became his children's sole caregiver. Still, as soon as he learned about Ella, respondent expressed his desire to eventually take Ella into his custody and care. Respondent immediately began visitation with Ella. He brought her age-appropriate snacks, cleaned her, and bonded healthily with his daughter. After DSS raised concerns about his living situation, respondent relocated to a new apartment. He submitted to three drug screens, two of which were negative and one inconclusive. He completed parenting classes to improve his ability to care for an infant.

Respondent also named his sister, who lived in California, as a potential relative placement option, although he was initially reluctant to request that DSS place Ella with her because she lived so far away. In April 2016, respondent asked DSS to initiate an Interstate Compact on the Placement of Children (ICPC) review process, and respondent's sister agreed to serve as Ella's guardian. After the North Carolina ICPC office misplaced the initial request, causing a months-long delay, respondent's sister called DSS to request an expedited home study to facilitate quicker ICPC approval. She visited with Ella on three occasions during her trips to North Carolina. Anticipating that she would promptly begin caring for Ella, respondent's sister purchased a crib; when the ICPC process was delayed, respondent's sister removed the crib and replaced it with a "princess bed." Ultimately, respondent's sister became a licensed foster parent and was assessed and approved to assume custody of Ella through the ICPC review process. In order to meet the ICPC's requirements, respondent's sister completed parenting courses, became CPR certified, and moved her entire family out of their home into one that would be safer for Ella because it did not have a pool. The ICPC report noted that respondent's sister possessed "considerable insight into the effects that separation and loss can have on children from her own experiences" in the foster care system.

Although respondent never disclaimed his intent to eventually assume custody of Ella, he also struggled to fully address the issues that he and DSS had identified in the voluntary out-of-home family services agreement. Respondent did not complete

the recommended domestic violence or substance abuse counseling. Respondent refused to consent to ongoing drug screens, and his social media history suggested that he may have been continuing to use marijuana. He was assaulted by three men who broke into his home while his children were present, causing him to be hospitalized for a dislocated jaw and stab wounds. He was evicted and lost his job. DSS reported that his home was cluttered and dirty. He had extended periods of inconsistent visitation with Ella, which respondent attributed to his lack of a driver's license, his injuries, and a death in the family. Eventually, respondent informed DSS that he was not interested in continuing to engage in parenting services and that he only wanted to maintain visitation with Ella. It is undisputed that respondent did not fully comply with all of the terms of the trial court's orders.

Respondent's final in-person visit with Ella occurred on 5 September 2017. On 22 January 2018, respondent moved to California. Respondent did not inform DSS of his impending move and did not immediately provide them with an address where he could be reached. On 10 April 2018, DSS filed a petition to terminate respondent's parental rights, alleging grounds of neglect, failure to make reasonable progress, willful abandonment, and failure to pay child support. Respondent did not communicate with Ella following his move to California until after DSS initiated termination proceedings.

Analysis

We begin by noting that DSS's and the trial court's actions repeatedly infringed upon respondent's constitutional parental rights. "[T]he government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status." *Adams v. Tessener*, 354 N.C. 57, 62, 550 S.E.2d 499, 503 (2001) (citations omitted). Immediately upon learning that he was Ella's biological father, respondent expressed his intent to parent Ella, an intent that he never disavowed. Until DSS filed a petition to terminate respondent's parental rights, DSS did not seek a judicial order establishing that respondent was "unfit to have custody" of Ella or that his "conduct [was] inconsistent with his . . . constitutionally protected status" as a parent. *Id*. Thus, as a biological father who had "seize[d] the opportunity to become involved as a parent in his child's life," *Owenby v. Young*, 357 N.C. 142, 146, 579 S.E.2d 264, 267 (2003), respondent enjoyed a constitutionally protected right to the "custody, care, and nurture" of his child. *Petersen v. Rogers,* 337 N.C. 397, 402, 445 S.E.2d 901, 904 (1994). The constitutional parental right is, of course, not absolute. *See, e.g.*, *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019). It is, however, a " 'fundamental liberty interest' which warrants due process protection." *In re Montgomery*, 311 N.C. 101, 106, 316 S.E.2d 246, 250 (1984) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)).

The trial court substantially interfered with respondent's "constitutionally protected paramount right" to the "custody, care, and control" of his child. *Owenby v. Young*, 357 N.C. at 148, 579 S.E.2d at 268. On 17 May 2017, respondent, through counsel, informed the trial court that he "loves his daughter [Ella] and desires for her to be placed with him, or, alternatively . . . if the child is not placed with Respondent Father, he respectfully requests the child to be placed with his sister . . . immediately." At that point in time, neither the trial court nor DSS possessed the legal authority to thwart respondent's wishes. If DSS had concerns about releasing Ella into respondent's custody, the way to address those concerns was by filing a petition to adjudicate Ella an abused, neglected, or dependent child, or by filling a petition to terminate respondent's parental rights. *See* N.C.G.S. § 7B-200, -904, -906.1. DSS's failure to file such a petition deprived the trial court of the legal authority to demand that respondent demonstrate his parenting abilities to the trial court's own satisfaction prior to taking Ella into his own custody, care, and control. It also deprived the trial court of the legal authority to dictate when, where, and how frequently respondent would be permitted to interact with his child. These requirements and restrictions had no binding legal effect, but the trial court treated them as preconditions respondent needed to satisfy, and parameters he needed to comply with, in order to exercise his constitutional parental rights.

The trial court ultimately concluded that the conditions imposed upon respondent's relationship with Ella served Ella's best interests, and its decision to

reject respondent's demand to assume custody of his child or have her placed with his sister flowed from a commitment to ensuring a safe, nurturing, and loving environment for Ella. However, the trial court did not have the authority to act on its own views of what served Ella's best interests without first finding grounds to displace respondent's constitutional parental rights to make such decisions. *See Owenby v. Young*, 357 N.C. at 144, 579 S.E.2d at 266 (The "Due Process Clause of the Fourteenth Amendment ensures that the government does not impermissibly infringe upon a natural parent's paramount right to custody solely to obtain a better result for the child"); *see also Troxel v. Granville*, 530 U.S. 57, 73–74 (2000) ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made.").[2] Until the trial court entered an order granting custody of Ella to DSS and taking custody away from her father on some legally cognizable ground, DSS and the trial court's desire to further Ella's best interests,

---

[2] Restrictions on the State's authority to interfere with a fit parent's exercise of their parental rights are not merely technical requirements. In the child welfare context, these statutory and constitutional protections help mitigate the risk that parents will lose custody of their children if public officials disagree with their approach to childrearing or because of racial, religious, gender, sexual orientation, or other biases. In cases such as this one, the potential for these biases, whether explicit or unconscious, to interfere with the proper disposition of a custody dispute underscores the importance of according due respect to a parent's constitutional and statutory rights. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 762–63 (1982) (explaining that "[b]ecause parents subject to termination proceedings are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias").

however well-intentioned, provided no justification for interfering with respondent's exercise of his constitutional prerogatives as Ella's parent.

Notwithstanding its prior lack of jurisdiction to conduct permanency planning and review hearings, the trial court did possess jurisdiction over DSS's petition to terminate respondent's parental rights under N.C.G.S. § 7B-1101. A court's jurisdiction to adjudicate a termination petition does not depend on the existence of an underlying abuse, neglect, and dependency proceeding. N.C.G.S. § 7B-1101 ("The court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion."). DSS had standing to seek termination of respondent's parental rights because Ella's mother had relinquished her own parental rights and transferred legal custody of Ella to the agency. N.C.G.S. § 7B-1103(a)(4).

Still, the trial court's errors in conducting unauthorized permanency planning and review hearings are significant in examining its subsequent order terminating respondent's parental rights. Because the trial court acted without subject matter jurisdiction during the permanency planning process, the hearings it conducted and orders it entered were "void ab initio." *In re T.R.P.*, 360 N.C. 588, 588, 636 S.E.2d 787, 789 (2006). A trial court cannot determine a party's rights based on facts established in or arising from a legally void judicial proceeding. *See Hart v. Thomasville Motors,*

*Inc.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956) ("A void judgment is, in legal effect, no judgment. No rights are acquired or divested by it. It neither binds nor bars any one, and all proceedings founded upon it are worthless.").

If the trial court made findings sufficient to prove grounds for termination based on facts that were independent from the invalid permanency planning and review hearings, then the mere fact that those invalid proceedings occurred would not preclude the trial court from also concluding that termination was warranted. However, facts inextricably intertwined with a legally void proceeding are necessarily insufficient to prove grounds for termination by clear, cogent, and convincing evidence. Reviewing the record against this backdrop and evidentiary standard, we hold that the trial court failed to find sufficient facts independent from the legally void permanency planning and review hearings to prove any of the three alleged grounds for terminating respondent's parental rights.

*a. Willful Abandonment*

The Court of Appeals affirmed the trial court's termination order by concluding that DSS had supplied sufficient evidence to prove willful abandonment. Accordingly, we address this ground first.

N.C.G.S. § 7B-1111(a)(7) provides for termination of parental rights where "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion." "[A]lthough the trial court may consider a parent's conduct outside the six-month window in evaluating a

parent's credibility and intentions, the determinative period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77, 833 S.E.2d 768, 773 (2019) (internal quotations omitted). "[W]hether a biological parent has a willful intent to abandon his child is a question of fact to be determined from the evidence." *Id* (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 276, 346 S.E.2d 511, 514 (1986)). At the adjudicatory stage, the petitioner bears the burden of proving willful abandonment by clear, cogent, and convincing evidence. *In re N.D.A.*, 373 N.C. at 74, 833 S.E.2d at 771.

To establish willful abandonment, the trial court must find evidence of conduct that is more serious than inconsistent attention to parental duties or less than ideal parenting practices. The trial court must instead find evidence that the parent deliberately eschewed his or her parental responsibilities in their entirety. *See In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612, 617 (1997). Abandonment requires "purposeful, deliberative and manifest willful determination to forego all parental duties and relinquish all parental claims to the child." *In re A.G.D.*, 374 N.C. 317, 319, 841 S.E.2d 238, 240 (2020) (cleaned up).

Almost all of the trial court's findings of fact in this case directly relate to the legally void permanency planning and review hearings, focusing mostly on respondent's alleged failures to comply with all of the conditions imposed by the trial court's orders. The Court of Appeals appropriately jettisons these facts, but then relies almost exclusively upon respondent's failure to attend permanency planning

hearings and scheduled visitations with Ella, mostly after his relocation to California, in finding that respondent willfully abandoned his child.[3] *In re E.B.*, 834 S.E.2d 169, 174–75 (N.C. Ct. App. 2019).

Respondent's decision to relocate to California must be assessed in the context of his ongoing efforts to take custody of Ella and bring her to California or to place Ella in the custody of his sister who lived in that state. As respondent stated at trial, his plan "was always for reunification. Once I had my daughter back home with me, I had plans to move to California and . . . she was supposed to come with us." In light of this express intent, respondent's actions do not "manifest a willful determination" to abandon his parental duties. When respondent relocated, his sister was awaiting

---

[3] The Court of Appeals also cited respondent's failure to personally attend a single child support hearing in January 2018. While failure to pay appropriate child support may be a ground for termination that is independent of an invalid underlying juvenile proceeding, the trial court did not find sufficient evidence proving that ground in the instant case. Further, a single missed child support hearing is, standing alone, insufficient to prove willful abandonment. *See Pratt v. Bishop*, 257 N.C. 486, 501–02, 126 S.E.2d 597, 608 (1962).

approval under the ICPC to take custody of Ella.[4] Respondent had already informed DSS that he intended "to allow [his] sister to handle the situation," which the trial court recognized "refer[ed] to Ella's care and placement." In this context, respondent's actions indicated an intent to let his sister complete the ICPC process and assume custody of Ella, not an intent to abandon Ella to DSS. The Court of Appeals has previously held, and we agree, that conduct that is "subject to other explanations"— in this case, the explanation that respondent had long planned to relocate to California with Ella, based on his belief that he would be able to take Ella with him or place her with his sister—"do[es] not inherently suggest a willful intent to abandon." *In re S.R.G.*, 195 N.C. App. 79, 86, 671 S.E.2d 47, 52 (2009).

Respondent's actions before the "determinative" six-month window are also relevant in interpreting whether his conduct during the window signified willful abandonment. *See In re K.N.K.*, 374 N.C. 50, 55, 839 S.E.2d 735, 739 (2020) (relying

---

[4] Because the ICPC review of respondent's sister was not completed until after DSS had filed the termination petition, DSS possessed legal authority to refuse to transfer Ella into respondent's sister's custody. We do not today reach the question of whether, after the trial court found grounds to terminate respondent's parental rights at the adjudicatory stage, the trial court's decision to terminate rather than permit respondent to transfer custody to his sister was an appropriate exercise of its discretion at the dispositional stage. N.C.G.S. § 7B-1110. However, we note that some of the trial court's apparent reasons for disregarding respondent's wish to place Ella in his sister's custody may not be sufficient, standing alone, to justify a refusal to place a child with a parent's desired relative. In particular, the trial court's findings that she possessed "negative attitudes" and made "negative posts on social media . . . towards the DSS and [petitioners]," her frustrations with the delayed ICPC process, and the fact that she authored a blog with a title that contained a sexual innuendo may not have been legally relevant in determining whether placement with respondent's sister was in Ella's best interests.

on evidence of a parent's "actions both prior to and during the determinative six-month period [to] support a reasonable inference of willfulness for purposes of N.C.G.S. § 7B-1111(a)(7)"). Respondent's ongoing efforts to obtain custody of Ella both before and during the determinative six-month window are simply inconsistent with a finding that he willfully intended to forgo all parental claims and responsibilities.

Other findings that the trial court relies upon cannot support willful abandonment because they are the direct result of the trial court's own interference with respondent's parental rights. The fact that respondent stopped attending permanency planning and review hearings and the fact that he communicated inconsistently with DSS after his move to California both arise directly from the trial court's legally invalid proceedings. Any purported obligation respondent had to attend the trial court's hearings and communicate regularly with DSS was created by proceedings that the trial court lacked subject-matter jurisdiction to conduct. Similarly, respondent's failure to attend visitations with Ella is inextricably intertwined with the fact that the trial court impermissibly precluded him from interacting with Ella in the time and manner that he saw fit, as was his right as her parent. The trial court lacked authority to control respondent's access to his child, and respondent's failure to comport with the trial court's restrictions is insufficient to prove willful abandonment. Further, it is relevant that respondent ceased visitation during the determinative six-month period immediately after a breakdown in his relationship with petitioners, in that there was another possible cause for

respondent's inconsistent visitation apart from a willful intent to abandon his child. *Cf. In re Young*, 346 N.C. at 252, 485 S.E.2d at 617 (1997) (considering finding of "the probable hostile relationship between respondent and petitioner's family members who cared for [respondent's child]" relevant in willful abandonment analysis). Respondent's actions, viewed in their appropriate context, do not clear the high threshold necessary to support a finding of willful abandonment. *See id.* at 251, 485 S.E.2d at 617 ("Abandonment implies conduct on the part of the parent which manifests a willful determination to forego *all* parental duties and relinquish *all* parental claims to the child.") (emphasis added) (citations omitted).

The Court of Appeals makes an unpersuasive distinction between respondent's "failures to comply with *the terms* of the void Permanency Planning Orders" and his alleged "failure *to attend* those proceedings [which] is nevertheless illustrative of Respondent-Father having willfully determined to forgo his parental duties." *In re E.B.*, 834 S.E.2d at 174 n.5. Regardless, respondent's failure to personally appear at the trial court's hearings did not forfeit his ongoing claim that he should be reunified with his child. Nor did it withdraw his request to place Ella with his sister. In these circumstances, and given that respondent never disavowed his intent to assume custody of Ella or place her with his sister, his failure to attend permanency planning and review hearings is insufficient to prove a willful intent to abandon his child.

Petitioners' reliance on *In re A.L.*, 245 N.C. App. 55, 781 S.E.2d 860 (2016), is similarly misplaced. While the mere existence of legally void proceedings does not

preclude a trial court from subsequently entering an order terminating parental rights, a trial court may only terminate a parent's rights when the petitioners have proven grounds for termination based on facts that are independent from the circumstances created by the legally void underlying proceedings. We hold that in this case, petitioners have failed to meet their burden to prove willful abandonment by clear, cogent, and convincing evidence that is not inextricably intertwined with the legally void permanency planning and review hearings.

Because petitioners need only prove a single ground for termination under N.C.G.S. § 7B-1111, we address the other two grounds the trial court found in terminating respondent's parental rights.[5]

*b. Neglect*

A trial court may terminate the parental rights of a parent who "has abused or neglected the juvenile." N.C.G.S § 7B-1111(a)(1) (2019). A neglected juvenile is statutorily defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or

---

[5] This case is not appropriate for remand for further factual findings because our responsibility under all three grounds for removal is to determine first, whether the evidence in the case supports the trial court's findings of fact, and then second, whether those findings support the trial court's conclusions of law. *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984). Where, as here, we conclude that the record evidence cannot support the necessary findings, there is no justification for a remand for further factual findings. Reversal is also appropriate because there are no material factual disputes relevant to this Court's holding that the evidence does not support termination on any of the grounds alleged by petitioners. *Cf, IMT, Inc. v. City of Lumberton*, 366 N.C. 456, 463, 738 S.E.2d 156, 160 (2013) (appropriate to resolve the substantive claim rather than remand the case where the facts are undisputed).

who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). When, as in this case, the juvenile "has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016).

Petitioners have failed to prove either that respondent previously neglected Ella or that there is a likelihood that he will neglect her in the future. Respondent has never had physical custody of Ella, and she has never been adjudicated a neglected child. Since shortly after Ella's birth, respondent has continuously been the sole caretaker for his three other minor children, none of whom have been adjudicated neglected. While these facts are not necessarily dispositive, together they impose upon the petitioners a burden that they have failed to carry. *See In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (holding that even a prior adjudication of neglect is not enough, on its own, to prove neglect in a termination proceeding).

The trial court's relevant findings of fact pertaining to this ground all relate to evidence developed during the legally invalid permanency planning and review hearings and flow from the assessments, recommendations and requirements imposed as part of that process. There is no evidence that respondent *actually* neglected Ella, and no basis to infer that he would have done so if Ella had been in his care, especially given that respondent was, at that same time, successfully caring for three other minor children.

The record was also devoid of any facts supporting a conclusion that respondent was likely to neglect Ella in the future. The only relevant findings pertaining to likelihood of future neglect are that "[t]he history of [respondent] since [Ella] was born suggests that marijuana use, unstable housing, changing employment and conflicts raised by his lifestyle will continue to be issues for him," that respondent "is not in a position to care for [Ella] due to his lack of responsible decision making, substance abuse issues, parenting struggles, and lack of overall stability," and that those issues are "barriers to a safe reunification with" Ella. From these facts, the trial court draws its conclusion that respondent "has not corrected the risk factors within his life that would allow him to appropriately and successfully parent [Ella], pursuant to N.C.G.S. § 7B-1111(a)(1)."

These findings are insufficient to support the conclusion that respondent is likely to neglect Ella in the future. *Cf. In re K.N.*, 373 N.C. 274, 282, 837 S.E.2d 861, 867 (insufficient evidence to prove likelihood of future neglect where juvenile had previously been adjudicated neglected and removed from home, parent was incarcerated, and evidence indicated parent had not fully complied with legally valid case plan). The trial court fails to analyze how these facts[6] connect with the specific

---

[6] Some of the facts relied upon by the trial court are contested (for example, respondent denies marijuana use during the relevant time period), some are subjective value judgments (the assertion of "conflicts raised by his lifestyle"), and some are circumstances that respondent shares with many other parents nationwide who will never neglect their children ("unstable housing" and "changing employment"). Hence, their probative value is questionable in any event.

determinative question of respondent's future likelihood of neglecting Ella. *Id.* at 283, 837 S.E.2d at 867–68 (holding that the "extent to which a parent's incarceration or violation of the terms and conditions of probation support a finding of neglect *depends upon an analysis of the relevant facts and circumstances*") (emphasis added). Further, the trial court fails to examine the "considerable change in conditions" in respondent's life that "had occurred by the time of the termination proceeding." *In re Young*, 346 N.C. at 250, 485 S.E.2d at 616. Notably, in addition to respondent's progress addressing at least some of the "risk factors" he had previously identified to DSS, respondent had also identified his sister as an appropriate alternative guardian for Ella.

Because petitioners have failed to prove that respondent previously neglected Ella and that he was likely to neglect Ella again in the future, Section 7B-1111(a)(1) does not support termination of respondent's parental rights.

*c. Failure to Make Reasonable Progress*

A trial court may terminate the parental rights of a parent who "has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S.§ 7B-1111(a)(2) (2019). Here, there must be a "nexus between the components of the court-approved case plan with which [respondent] failed to comply and the conditions which led to [the juvenile's] removal from the

parental home." *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019). A parent is required to make "reasonable progress . . . in correcting *those conditions which led to the removal of the juvenile.*" N.C.G.S.§ 7B-1111(a)(2) (2019). Petitioners essentially contend that respondent's voluntary out-of-home family services agreement both identifies the "conditions" which "led to the removal" of Ella from his home (e.g., DSS's refusal to allow respondent to assume custody of Ella) and the benchmark against which the trial court could evaluate his "progress." They argue that respondent's failure to make reasonable progress towards addressing the risk factors outlined in his voluntary out-of-home family services agreement provides sufficient factual evidence to terminate his parental rights.

We reject the argument that failure to comply with a voluntary out-of-home family services agreement constitutes grounds for termination under § 7B-1111(a)(2). It is settled law that "removal" as used within § 7B-1111(a)(2) only occurs when a court acting with appropriate jurisdiction enters an order placing a child into the custody of someone other than the child's parents. *In re J.S.*, 374 N.C. 811, 845 S.E.2d 66, 71 (2020) ("[A]n adjudication under N.C.G.S. § 7B-1111(a)(2) requires that a child be left in foster care or placement outside the home *pursuant to a court order* for more than a year at the time the petition to terminate parental rights is filed.") (emphasis added) (cleaned up); *see also In re Pierce*, 356 N.C. 68, 73, 565 S.E.2d 81, 85 (2002) (determining that a child was removed within the meaning of § 7B-1111(a)(2) "when the trial court awarded custody of the child to DSS, and she was placed in foster

care"). As the Court of Appeals has correctly held, permitting this ground to apply to voluntary separations would unnecessarily subject parents to the risk of termination even when their "reasons" for transferring custody of their child do not "implicate the child welfare concerns of the State." *In re A.C.F.*, 176 N.C. App. at 525, 626 S.E.2d at 733. Further, such a broad interpretation of § 7B–1111(a)(2) may cause parents to avoid voluntarily seeking out much-needed assistance from DSS for fear of permanently losing their parental rights. Because DSS never filed a petition to adjudicate Ella abused, dependent, or neglected, no legally valid order ever "removed" Ella from respondent's custody. Therefore, Section 7B-1111(a)(2) does not support termination of respondent's parental rights.

## Conclusion

Petitioners bear the burden of proving that grounds exist for terminating respondent's parental rights, based on facts that arise independently from the legally void permanency planning proceedings. As we hold that petitioners have failed to meet this burden, we reverse the Court of Appeals decision.

REVERSED.

Justice NEWBY concurring in result only.

I agree with the majority that because no abuse, neglect, or dependency petition was filed, the trial court lacked jurisdiction to conduct the initial permanency planning and review hearings here, and that the trial court's findings that were not based on the void orders and proceedings are insufficient to support the termination of respondent's parental rights. Accordingly, the matter should be remanded to the trial court. In its analysis, the majority improperly finds facts in this case, which is a job reserved for the trial court, and addresses issues unnecessary to resolve this matter, rendering much of the discussion dicta. Thus, I concur in the result only.